UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

NERY CHERY,

        Plaintiff(s),                    Case Number 18-1240

NATIONSTAR MORTGAGE LLC AND/OR NATIONSTAR MORTGAGE HOLDINGS INC., FORTRESS INVESTMENT GROUP LLC, WESLEY R. EDENS

        Defendant(s).

-------------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff NERY CHERY ("Ms. Chery"), by her counsel J.A. Sanchez-Dorta, for her Verified Complaint against all Defendant (s), alleges as follows, with all allegations made upon information and belief:

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 18 U.S.C. §§ 1961, 1962, 1964 and 28 U.S.C. § 1331.

2. Venue is proper in this Court based upon 28 U.S.C. §§ 1391 (b) and (c).

### PARTIES

3. Plaintiff Ms. Nery Chery ("Ms. Nery Chery" or "Ms. Chery"), is and has been a resident of the State of New York, having an address at 108-51 48th Avenue, Corona, New York 11368 (hereinafter, the "Premises" or the "Home") on all pertinent dates hereinafter mentioned.

4. Defendant(s) Nationstar Mortgage LLC and/or Nationstar Mortgage Holdings Inc. ("Nationstar") was founded in 1994 and is headquartered in Lewisville, Texas. Controlled

by Fortress Investment Group LLC, the company provides residential mortgage loan services in the United States and consists of Nationstar and Solutionstar, a business which provides technology and data enhanced solutions to the real estate market and companies engaged in the origination and/ or servicing of mortgage loans. Nationstar has a servicing portfolio in excess of $385 billion and over 2 million customers, and currently employs over 6,000 full time employees. Nationstar is a Delaware Foreign Limited Liability Company which does business in and throughout New York State.

5. Defendant Fortress Investment Group LLC ("Fortress") is a leading global investment management firm, a Delaware Foreign Limited Liability Company which does business in New York County, New York State.

6. Fortress was founded as a private equity firm in 1998 by Defendant Wesley R. Edens, ("Mr. Edens"), an individual doing business in New York via Fortress and Nationstar.

## FACTUAL BACKGROUND
## ALLEGATIONS RELATING TO ALL COUNTS

7. Ms. Nery Chery, together with her parents, Jose Chery and Cecilia Chery, has owned the property located at and known as 108-51 48th Avenue, Queens, New York (the "Premises") since August 13th, 1979. She has occupied the Premises from that time till today's date, over 37 years, as her primary residence.

8. Ms. Chery, whose first language is Spanish and who speaks very little English, is not sophisticated in real estate and mortgage lending, yet hoped to find a way to pay off the mortgage on the Premises of $155,000 and lower her monthly mortgage payments. On the advice of her attorney, Jeffrey Rosenberg, on June 5, 2001, she and her parents deeded the Premises to her cousin, Alejandro Diaz with, oddly enough, back to back deeds, with Jose Chery, Cecilia Chery, and Nery Chery first deeding the Premises to Jose Chery and Cecilia

Chery, and then Jose Chery and Cecilia Chery then deeding the Premises to Alejandro Diaz.

9.  Upon information and belief, there would have been no valid reason to have developed such an indirect fashion of deeding the Premises, and such oddly and indirect deeding of a Premises is often done in order to carry out some sort of mortgage fraud.

10. Such an indirect fashion of deeding the Premises would have stood out as a "red flag" to any subsequent mortgage lender that some sort of fraud had been perpetrated during the first transfer of the Premises of June 5, 2001.

11. Nevertheless, upon information and belief, there is no financial incentive for a subsequent mortgage lender to uncover such a "red flag" and, rather, there exists a financial incentive for the mortgage lender to overlook the "red flag" as the mortgage would have been packaged with other mortgages as security instruments, and sold to unwitting investors.

12. Thus, upon information and belief, in a pattern that would be repeated several times over during the next few years, by different mortgage lenders, each mortgage lender overlooked any "red flags", made the loan and, upon information and belief, sold the same as part of a securitized package to unwitting investors, because they would receive financial compensation as a result of the fraud.

13. Each of these mortgage lenders, thus, engaged in a "fencing" operation in violation of Federal and New York State laws.

14. The book *Predator Nation*, by Charles Ferguson, Director of the Academy Award winning Film *Inside Job* provides some insight into why and how these "red flags" were intentionally never heeded:

"The collapse of the S&L industry in the late 1980's and early 1990's, combined with the start of the housing bubble, led to the spectacular growth of highly unethical mortgage

lenders, many of them in the largely unregulated shadow banking center. These lenders, who drove the worst excesses of the bubble, were *not* traditional banks that took consumer deposits for savings and checking accounts. They existed solely to feed the securitization chain, and they got their funding from Wall Street - from the same investment banks and financial conglomerates that bought their loans[1] … So the lenders wanted everyone to borrow ever more, and actively preferred borrowers who didn't understand mortgages, shouldn't have them, could be defrauded, and/or couldn't fight back after being screwed ... This kept money flowing to naive investors such as municipal pension funds and small overseas banks, which collected high returns without any defaults for a few years until the music stopped.[2]"

15. During that first transfer, the prior mortgage of $155,000 was satisfied, but in exchange, and without the knowledge of Nery Chery, the new mortgage on the Premises was $358,000. Ms. Chery never received any of the difference in funds between the new $358,000 obligation and the prior $155,000 obligation and, thus, $203,000 were appropriated by others.

16. Ms. Chery was left with the Premises now being held by her cousin, Alejandro Diaz, and with her now required to pay a higher mortgage payment to him, so that he could pay the same to the new mortgage holder, Indymac Bank, F.S.B.

17. Indymac, F.S.B., who was in the best position to have determined that there was fraud in the mortgage transaction, and should have stopped the transaction, intentionally permitted the fraudulent transaction to proceed, sold that mortgage as part of a securitized package of other similar mortgages to investors, recouped the $358,000, and received fees from the origination of the mortgage loan.

18. As the burden of the new mortgage payment soon began to be too much for Ms. Chery to handle, her cousin, Alejandro Diaz, introduced her to a person named Juan Pablo, who

---

[1] *Predator Nation*, Charles Ferguson, page 60.

[2] *Predator Nation,* page 73.

promised Ms. Chery that there was a way to reduce the burden of her then mortgage, which was $358,000.

19. Subsequently, she received a visit at her home from a group of young men, who informed her that Indymac had had some sort of problem, and that her loan was now with Franklin First Financial. Ms. Chery states that these individuals were named Michael Balbo and Timothy Messina, and they introduced her to John Aita, whose Linkedin Page lists him as Regional Sales Manager Franklin First Financial.

20. These men assured Ms. Chery that they would assist Ms. Chery in repairing her credit and repaying her mortgage. They told her that they merely required that the Premises be transferred to her name, and then subsequently transferred to their names, and they promised her that they would return the Premises to her within one year.

21. Although this sounded too good to be true, and was, in fact, too good to be true, Ms. Chery was deceived by these fellows' seemingly earnest profession of their willingness to help her.

22. Thus, on August 17, 2004, the Premises were once again transferred by deed between Alejandro Diaz, as grantor, and Alejandro Diaz and Nery Chery, as Grantee.

23. Ms. Chery remembers from that date that she was taken to an office at Franklin First Financial, that she was then taken to a large room filled with about 30 people, and that they introduced her to a lawyer, who said he would represent her (although he didn't even speak Spanish, and she can only understand very little English).

24. She can recall that there were a lot of checks being signed and handed around, and when she inquired why she was not receiving any checks, she was told "Don't you worry about it".

25. On that date and at that place at Franklin First Financial, another mortgage was taken out on the Premises, in the amount of $510,000, with Alejandro Diaz and Ms. Chery as the mortgagors, and group of private persons as the mortgagees (Veronica Muth [as to $150,000], Ken Kasten and Susan Kasten [as to $52,500], Carol Anastos and Ray Anastos [as to $52,500], Carol Ferrara [as to $100,000], Michael Marron [as to $75,000], and Thomas Marron [as to $80,000]), with a term of 6 months, an interest payment of 14% per month, and a monthly payment of $5,950.

26. Again, Ms. Chery was unaware that there was a mortgage taken out on the Premises (although she was introduced to an attorney who said he would represent her, she was not *actually* provided with an attorney, as the section of the Real Property Transfer Report space marked for "Buyer's Attorney" is marked N/A [not applicable], although the mortgagees all had their own attorneys). Moreover, although one would assume that the mortgage with Indymac of $358,000 was paid off with this loan, the difference between the new $510,000 mortgage and the previous $358,000 mortgage, that is, $158,000, was never received by Ms. Chery, and thus, must have been appropriated by others (very likely, Mr. Messina, Mr. Balbo, and Mr. Aita).

27. About two months later, Timothy Messina called Ms. Chery and told her that she needed to sign the deed to the Premises over to him. When she asked why this was necessary, she was told that it was necessary in order for him to save her house. He told her that if this was done, he would save her house, and Ms. Chery would have the deed to the Premises back in her name within one year (and that if she didn't do what he advised her to do, she would lose the Premises to foreclosure).

6

28. Again, Ms. Chery trusted Ms. Messina and the group at Franklin First Financial, believed that they had her best interest in mind, and mistakenly assumed that they were not trying to take advantage of her.

29. On April 27, 2005, Alejandro Diaz and Ms. Chery transferred the deed to the Premises to Michael Balbo, Timothy Messina, and John Aita (whose Linkedin Page lists him as Regional Sales Manager Franklin First Financial), who took the deed to the Premises as tenants in common, and listed their address as 173 Bay 47th Street, Brooklyn (the Gravesend area of Brooklyn).

30. These fellows financed their acquisition of the Premises with a mortgage loan by Argent Mortgage Company LLC to Michael Balbo, Timothy Messina and John Aita (whose Linkedin Page lists him as Regional Sales Manager Franklin First Financial) as mortgagors for $630,000, backed by a mortgage on the Premises for $630,000.

31. On October 20th, 2005, Michael Balbo, Timothy Messina and John Aita (whose Linkedin Page lists him as Regional Sales Manager Franklin First Financial) also took out a Credit Line Mortgage in the amount of $30,000, backed by the Premises, from J.P. Morgan Chase Bank, N.A. Upon information and belief, Michael Balbo, Timothy Messina and John Aita, paid off the "private investors" and pocketed what remained, that is, $660,000, minus the $510,000 that needed to be repaid to the investors, plus whatever fee required by the investors, for a total of up to $150,000.

32. Argent Mortgage and JP Morgan, who were in the best position to have determined that there was fraud in the mortgage transaction, and should have stopped the transaction, intentionally permitted the fraudulent transaction to proceed, sold the mortgage as part of

a securitized package of other similar mortgages to investors, recouped, respectively, the $630,000 and $30,000, and received fees from the origination of the mortgage loans.

33. On April 26, 2006, Michael Balbo, Timothy Messina and John Aita (whose Linked in Page lists him as Regional Sales Manager Franklin First Financial) transferred the Premises by Deed to a Mela Kissoon Persaud for the price of $900,000.

34. The Schedule A Description attached as part of the deed from that transaction is emblazoned with the name of Fidelity National Title Insurance Company, the same company which appears on the deed to Michael Balbo, Timothy Messina and John Aita (whose Linkedin Page lists him as Regional Sales Manager for Franklin First Financial), suggesting that it was this company that prepared the title report for that transfer. Thus, it appears that that these fellows had a favorite title insurance company, that is, Fidelity National Title Insurance Company, who likely received its favored position because it could be counted on to overlook the fraud in a particular transaction.

35. This purchase was financed with a mortgage to MERS as Mortagee of record to BNC Mortgage Inc. in the amount of $810,000. Upon information and belief, Michael Balbo, Timothy Messina and John Aita (whose Linkedin Page lists him as Regional Sales Manager Frankl in First Financial), together with their co-conspirator Mela Kissoon Persaud, may have pocketed at the very least $180,000 (the $810,000 from these loan proceeds, minus the existing mortgage of $630,000, and perhaps up to $270,000 (the full $900,000, minus the existing mortgage) from the sale of the Premises.

36. Nevertheless, it is more likely that, rather than collecting the full $270,000 (the difference between the $900,000 and $810,000), $90.000 down payment by Mela Kissoon Persaud was falsified, and Michael Balbo, Timothy Messina and John Aita (whose Linkedin Page

lists him as Regional Sales Manager Franklin First Financial) split the $180,000 excess from the proceeds from the mortgage loan from BNC Mortgage Inc. with Mela Kissoon Persaud.

37. BNC Mortgage Inc., who was in the best position to have determined that there was fraud in the mortgage transaction, and should have stopped the transaction, intentionally permitted the fraudulent transaction to proceed, sold that mortgage as part of a securitized package of other similar mortgages to investors, recouped the $810,000, and received fees from the origination of the mortgage loan.

38. The belief that Michael Balbo, Timothy Messina and John Aita (whose Linkedin Page lists him as Regional Sales Manager Franklin First Financial) split the $180,000 excess from the proceeds from the mortgage loan from BNC Mortgage Inc. with Mela Kissoon Persaud is grounded upon the appearance that Mela Kissoon Persaud has been involved in similar fraudulent real estate transactions. For example, in connection with another property, 25-52 100th Street, Queens, New York 11369, this property, with initially little debt, was acquired by successive persons with several deed transfers over a relatively short period, with increasing mortgages acquired at each deed transfer, until Mela Kissoon Persaud acquired that property on 4/27/2006, took out a mortgage on that property for $467,000 at the closing, and transferred the deed back to the original owner on l0/29/2007 for $10. Then that property, previously debt free but now laden with debt, was sold in foreclosure on 5/10/2009. The signatures of the Mela Kissoon Persaud on the pages involved in that property's transfers and loans certainly look similar to the signatures of the Mela Kissoon Persaud involved in the Premise's transfer, suggesting that this is the same person.

39. Upon information and belief, no payments were made on the BNC Mortgage.

40. The BNC Mortgage had specified that " 'MERS' is 'Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns…FOR PURPOSES OF RECORDING THIS MORTGAGE, MERS IS THE MORTGAGEE OF RECORD".

41. On August 22, 2007, Lehman Brothers announced it would be shutting down BNC Mortgage, its subprime mortgage lending unit, which was one of the top 20 subprime producers in 2006 (the year the BNC Mortgage of $810,000 was taken out by Mela Kissoon Persaud against the Premises), originating over $14 Billion in loans.

42. Foreclosure proceedings were commenced by MERS in early 2007.

43. MERS was the named Plaintiff in that foreclosure lawsuit.

44. Upon information and belief, in some mortgage transactions, the mortgagee will designate MERS as the mortgagee (solely as a nominee for the lender). These loans are referred to as MERS Original Mortgagee (MOM) loans (This appears to be what occurred in the BNC Mortgage).  MERS then tracks the transfers of the loan, acting as the nominee for each holder, eliminating the need for separate assignments when the loan is transferred. Since the loan is in MERS' name in the land records, this saves time and recording costs because multiple assignments are not necessary each time the loan changes hands.

45. MERS does not own the underlying debt. While MERS then acts as mortgagee in county land records, it does not actually own or possess the promissory note evidencing the debt.

46. New York State courts have determined that an entity that does not own the promissory note evidencing the debt lacks standing to begin foreclosure proceedings.

47. Consequently, MERS cannot be the plaintiff in a foreclosure in New York State, unless it can prove it also owned and held the original promissory note at the time the foreclosure action was commenced.

48. Nevertheless, in the foreclosure action against the Premises, which was based on a mortgage obtained by fraud, the proceeds of which went to pay persons who had committed a crime against Ms. Nery Chery, MERS initiated the foreclosure action as Plaintiff against Mela Kissoon Persaud, as Defendant.

49. Mela Kissoon Persaud did not defend against the foreclosure, and Nery Chery attempted to intervene in the foreclosure but, opposed by papers submitted by several different law firms, she was unable to stop the foreclosure.

50. MERS subsequently transferred the mortgage on the Premises via an Assignment dated 9/11/2013 to Nationstar.

51. Subsequently, MERS bid on the Premises at the foreclosure sale held on April 11, 2014, and assigned that bid to Nationstar, for the sum of $10, on April 22, 2014.

52. Nationstar acquired the Deed to the Premises after the foreclosure sale of the Premises.

53. Nationstar is controlled by Fortress. Fortress is a leading global investment management firm based in New York City. Fortress was founded as a private equity firm in 1998 by Mr. Edens, a former partner at BlackRock Financial Management, Inc., Rob Kauffman, a managing director of UBS, and Randal A. Nardone, also a managing director of UBS. Fortress quickly expanded into hedge funds, real estate-related investments and debt securities, run by Michael Novogratz and Pete Briger, both former partners at Goldman Sachs. Mr. Edens became Co-Chairman of the Board of Directors at Fortress in 2009, and

helped Nationstar, which saw its stock fall after the subprime mortgage crisis, resurge by changing its business model.

54. An article in the Wall Street Journal, entitled, "Meet the New King of Subprime Lending (Fortress Investment's Wesley Edens turns $124 million into $3.5 billion; 'it's not a bad thing')" provides some insight into what Fortress promotes as the new business model it has developed for Nationstar (along the lines of what Nationstar deceptively describes as its business model in its Form 10K for the fiscal year ending on December 31, 2016 filed with the Securities and Exchange Commission [the "Form 10K"]):

"Fortress also has turned around its $1 billion investment in Nationstar Mortgage Holdings Inc., led by Mr. Edens in 2006 but soon worthless, into $350 million in paper and actual gains. Nationstar collects payments on home loans, about 20% of which are subprime."

"Mr. Edens also made the deal in 2006 for Fortress's private-equity funds to buy Nationstar for $300 million. It looked like a disaster, too. When the deal was struck, Nationstar was considered a high-quality subprime lender. Less than a year later, borrowers began defaulting in droves on their loans, the sector collapsed and Fortress's investment was worthless. 'It couldn't have been a more poorly timed purchase,' Mr. Edens says.
Fortress shut down Nationstar's loan-origination business and tried a new strategy to salvage something from its bet. The firm spent $700 million to transform Nationstar into a star in mortgage servicing. Loan servicers do much of the back-end work after mortgages are made.
Since then, Nationstar, based in Dallas, has gained market share from banks, many of which have retreated from the servicing business. The company went public in 2012, and its shares are up more than 29% since then.
But the loan servicer's compliance department has ballooned to 400 employees from 40 just a few years ago amid growing regulatory scrutiny of the industry. Nationstar's stock price as tumbled more than 40% over the past 52 weeks, though it's still sitting on sizable gains."[3]

55. What the Wall Street Journal article demonstrates is that Mr. Edens was able to execute a brilliant strategy to turn around into an exceedingly profitable business what might have otherwise resulted in a complete loss.

---

[3] http:// www.wsj .com/articles/meet-the-new-king-of-subprime- lending-1439260441.

56. Nevertheless, what the Wall Street Journal article fails to pick up on (and this is not the fault of the Wall Street Journal, because this fact is not included in the Form 10K) is that Nationstar's business, as it pertains to Ms. Chery's home and, very likely, thousands of other homes throughout New York State and the United States, is not limited to "loan servicing", that is, "the back-end work after mortgages" (as the servicing of loans which are not being paid should not be an exceedingly profitable business), but ultimately, the "fencing" (through what appears to be a legitimate business, the business described in the Form 10K) of properties it knows have been mortgaged, and ultimately are in the process of being foreclosed upon, through acts of criminal fraud and theft of others, by purchasing the right to foreclose on the same relatively cheaply, adding value by engaging in other criminal and fraudulent acts (acts which others might not be willing to risk being involved in) to secure the foreclosure of the same, and then seeking to sell the same at market price to a *bona fide* purchaser.

57. Ultimately, Nationstar, through the intentional design of Mr. Edens and Fortress, has acted as a "fence" with regards to the Premises, and hundreds, or even thousands of homes like it.

58. Wikipedia defines a "fence" as follows:

> "*A fence or receiver is an individual who knowingly buys stolen property for later resale, sometimes in a legitimate market. The fence thus acts as a middleman between thieves and the eventual buyers of stolen goods who may not be aware that the goods are stolen.* As a verb, the word describes the behaviour of the thief in the transaction: The burglar fenced the stolen radio. This sense of the term came from thieves' slang, first attested c. 1700, from the notion of such transactions providing a *defence* against being caught…
> *The fence is able to make a profit with stolen merchandise because he/she is able to pay thieves a very low price for stolen goods. They then disguise the stolen nature of the goods, if possible, so that they can sell them closer to the white market price. This process often relies on a legal business conducting legal safes*…Fencing is illegal in all countries, but legally proving a violation of antifencing laws can be difficult." [Emphasis added]

59. The above italicized portions of the definition of "fence" precisely describe Nationstar's business model, as intentionally designed by Mr. Edens and Fortress. This attorney has uncovered several other matters involving Nationstar's fencing of foreclosure properties in different areas of New York State. In each matter, the particulars of the scheme behind the foreclosure is different, as each scheme is intended to secure the sale at foreclosure for eventual sale to a *bona fide* purchaser of properties worth hundreds of thousands of dollars and, thus, the effort utilized to develop and carry out each scheme is worth the expenditure of time, effort and resources by Nationstar, and the attorneys it utilizes to carry out each particular scheme.

60. It is true that "legally proving a violation of anti-fencing laws can be difficult." That is the primary advantage of a fencing operation, from the point of view of the fence. The fence has a legal business conducting legal sales or services that serves as a cover for where the fence actually secures his profit, from buying stolen goods on the cheap, and then laundering the stolen goods via a sale at a market price to a *bona fide* purchaser.

61. But for the involvement of the "fence", criminals would lack a ready market enabling them to extract profit from their crimes. But for the existence of the "fence", there would be no incentive to commit a crime, and for this reason "fencing" activities are a crime, under both New York State and Federal laws.

62. The Defendants have utilized a legitimate business (which Mr. Edens and Fortress had made the mistake of buying at the top of the market in 2006, initially losing hundreds of millions on the acquisition when the market for mortgage lending immediately fell after acquisition due to the so-called "mortgage lending meltdown"), to enter into the far more lucrative stolen home "fencing" business.

14

63. That "fencing" business involves (via the intelligence gathered, and access granted, by its legal, but far less lucrative mortgage servicing business) the locating of potential opportunities to secure, relatively inexpensively, the right to foreclose on properties placed into foreclosure by another person's fraudulent acts against the true homeowner.

64. That "fencing" business also involves Nationstar's purchase and interstate assignment and transfer of notes (which notes are often altered or otherwise forged in order to deceive local courts into believing that the same satisfy court requisites, or which notes are otherwise falsely represented in affidavits filed in courts throughout the country to be true copies of the original notes, when the original notes have actually been lost and no longer exist), the purchase and interstate transfer of mortgage assignments prepared via misrepresentations designed to deceive courts and homeowners, and the securing of the foreclosures of homes via misrepresentations made in court papers under oath during the judicial process of foreclosure.   This "fencing" business results in the laundering of the criminal acts of others to secure the foreclosure sale of these homes and their subsequent sale to *bona fide* purchasers, and this "fencing" business was set up in order for Mr. Edens and Fortress to recuperate from the loss occasioned by their "poorly timed" purchase of Nationstar.

65. Nationstar's business model, as intentionally designed by the Mr. Edens and Fortress, differs from that of a pawn shop owner "fence", who uses his legal pawn shop business to buy stolen watches, etc., on the cheap to sell at or near market price to a *bona fide* purchaser, only in the complexity, sophistication, and monetary size of the illegal transactions it engages in.

66. Nationstar's business model, as intentionally designed by Mr. Edens and Fortress, violates the National Stolen Property Act, 18 U.S.C. §§ 2314 – 2315, which provides, in relevant part, as follows:

18 U.S.C. § 2314 - Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting

Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; or

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transports or causes to be transported, or induces any person or persons to travel in, or to be transported in interstate or foreign commerce in the execution or concealment of a scheme or artifice to defraud that person or those persons of money or property having a value of $5,000 or more; or

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited; or

….

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce, any tool, implement, or thing used or fitted to be used in falsely making, forging, altering, or counterfeiting any security or tax stamps, or any part thereof; or

…

Shall be fined under this title or imprisoned not more than ten years, or both...


18 U.S.C. §2315 - Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps

Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken; or

Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any falsely made, forged, altered, or counterfeited securities or tax stamps, or pledges or accepts as security for a loan any falsely made, forged, altered, or counterfeited securities or tax stamps, moving as, or which are a part of, or which constitute interstate or foreign

commerce, knowing the same to have been so falsely made, forged, altered, or counterfeited; or

Whoever receives in interstate or foreign commerce, or conceals, stores, barters, sells, or disposes of, any tool, implement, or thing used or intended to be used in falsely making, forging, altering, or counterfeiting any security or tax stamp, or any part thereof, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing that the same is fitted to be used, or has been used, in falsely making, forging, altering, or counterfeiting any security or tax stamp, or any part thereof; or

…

Shall be fined under this title or imprisoned not more than ten years, or both…

67. The term "securities" for the purpose of the National Stolen Property Act is defined in 18

    U.S.C. §2311 to include a note, such as the note and other related documentation

    (assignment of mortgage, deed, etc.) regarding the Premises:

    "Securities" includes any *note*, stock certificate, bond, debenture, check, draft, warrant, traveler's check, letter of credit, warehouse receipt, negotiable bill of lading, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate; valid or blank motor vehicle title; *certificate of interest in property*, tangible or intangible; *instrument or document or writing evidencing ownership* of goods, wares, and merchandise, or *transferring or assigning any right, title, or interest* in or to goods, wares, and merchandise; or, *in general, any instrument commonly known as a "security"*, or any certificate of interest or participation in, temporary or interim certificate for, receipt for, warrant, or right to subscribe to or purchase any of the foregoing*, or any forged, counterfeited, or spurious representation of any of the foregoing*. [emphasis added]

68. The National Stolen Property Act is applicable in every way to what the Defendants did,

    with the Premises, a home, and the related deed, note and/or mortgage, that were acquired

    through the criminal acts of their "predecessors in interest", and which were utilized

    through the Defendants' own criminal acts to secure the foreclosure of the Premises with

    the purpose of "fencing" the Premises via its sale to a potential *bona fide* purchaser.

69. The Defendants acts also violate New York State Laws prohibiting "fencing" activities.

70. Thus, throughout the period as outlined above, Ms. Nery Chery has been defrauded by a whole host of characters, all of whom took advantage of a byzantine system of mortgage lending which utilized the Premises, her most significant asset, as leverage to produce income for each of these actors, and to then exploit weaknesses in the legal system to, ultimately, foreclose on the Premises with the goal of "fencing" the Premises to a potential *bona fide* purchaser to secure income for the Defendants.

71. Nationstar, Fortress, and Mr. Edens are not *bona fide* purchasers but, rather, are "fences" who expect to sell the Premises to a *bona fide* purchaser.

72. They and their predecessors in interest knew, given the fact that a) they are all sophisticated players in the financial industry, b) had reviewed the paper work involved in the foreclosure action regarding the Premises, and c) acted upon the advice and with the assistance of legal counsel, that they were purchasing a property that had been stolen from Ms. Chery via the use of fraudulent and criminal acts.

73. Nevertheless, not only were the Defendants not dissuaded by the fact that the Premises had been stolen, but they were attracted to the Premises (and are likewise attracted to other properties like it throughout the United States) precisely for the reason that it was stolen property, as they would be able to purchase the right to foreclose on the Premises for a relatively low price, secure the foreclosure of the Premises via the use of forged and altered documentation, and perjured affidavits swearing to the validity of this documentation, do so without any effective opposition due to legal loopholes that left Ms. Chery with no plausible means of opposing them, and then be able to resell the Premises to a *bona fide* purchaser at a high price, as Nationstar's entire business model is intentionally set up by Mr. Edens and Fortress as a sophisticated "fencing" operation.

**AS AND FOR A FIRST CAUSE OF ACTION**
**Conduct and Participation in a RICO Enterprise**
**through a Pattern of Racketeering Activity:**
**18 U.S.C. §§ 1961(5), 1962(c)**

74. Plaintiff(s) now re-allege each and every allegation as set forth above, and hereby incorporate the same by reference, as if all were set forth fully herein.

75. At various times and places partially enumerated above, all Defendants did associate with a RICO enterprise of individuals who were associated in fact and who engaged in, and whose activities did affect, interstate and foreign commerce.

76. If any of the Defendants could be termed the ringleader(s) of said RICO enterprise of individuals who were associated-in-fact, it would be Mr. Edens.

77. This association-in-fact RICO enterprise possessed, without limitation, the following three characteristics: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *See Boyle v. United States*, 129 S.Ct. 2237 (2009).

78. Plaintiff(s) allege that in this association-in-fact RICO enterprise its members shared the common purpose to seize control of the Premises through the foreclosure of the Premises, in which each member carried out its role in the enterprise to extract as much money as possible from its control of the Premises, exploiting vulnerabilities within the mortgage banking system, and the foreclosure process, and which enterprise operated over several years in order to complete its purpose.

79. Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise (by being employed by, associated with, operating and/or managing said enterprise) through a pattern of racketeering activity, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

80. All Defendants did also during a period at least within the last ten years cooperate jointly and severally in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at 18 U.S.C. § 196l(l)(B): 18 U.S.C. § 1341 - Frauds and Swindles [relating to mail fraud]; 18 U.S.C. § 1343 - Fraud by Wire, Radio or Television [relating to wire fraud]; 18 U.S.C. § 1344 - Bank Fraud [relating to financial institution fraud]; 18 U.S.C. § 1503 [relating to obstruction of justice]; 18 U.S.C. § 1956 - Laundering of Monetary Instruments [relating to the laundering of monetary instruments]; 18 U.S.C. § 2314 [Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting]; and 18 U.S.C. § 2315 [Sale or receipt of stolen goods, securities, moneys, or fraudulent State tax stamps]; and did so in violation of the RICO law at 18 U.S.C. l 962(c) (Prohibited activities) as set forth above.

81. Plaintiff(s) further allege that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of the RICO law at 18 U.S.C. 1962(c) supra.

82. Plaintiff(s) also allege that they are not the only person that has been victimized by this RICO enterprise but, in fact, this RICO enterprise has victimized other persons and will if permitted to continue to operate victimize other persons throughout New York State and the United States of America.

83. Plaintiff(s) further allege that they suffered injury to their business or property, including, without limitation, the loss to foreclosure of the Premises, which Premises is worth approximately Eight Hundred Thousand United States Dollars in the present market and

such predicate acts of the racketeering activity as mentioned above were the proximate

cause of such injury and/or damages.

84. Plaintiffs allege that civil liability attaches to each Defendant on account of the above, and

that the enterprise is distinct from each Defendant person.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Conspiracy to Engage in a**
**Pattern of Racketeering Activity:**
**18 U.S.C. §§ 1961(5), 1962(d)**

85. Plaintiff(s) now re-allege each and every allegation as set forth above, and hereby

incorporate the same by reference, as if all were set forth fully herein.

86. At various times and places partially enumerated above, all Defendants did also conspire

to conduct and participate in said RICO enterprise through a pattern of racketeering

activity, in violation of 18 U.S.C. §§ 1962(c) and (d). See also 18 U.S.C. §§ 1961(4), (5)

and (9).

87. All Defendants did also during a period at least within the last ten years cooperate jointly

and severally in the commission of two (2) or more of the RICO predicate acts that are

itemized in the RICO laws at 18 U.S.C. § 1961(1)(B): 18 U.S.C. § 1341 - Frauds and

Swindles [relating to mail fraud]; 18 U.S.C. § 1343 - Fraud by Wire, Radio or Television

[relating to wire fraud]; 18 U.S.C. § 1344 - Bank Fraud [relating to financial institution

fraud]; 18 U.S.C. § 1503 [relating to obstruction of justice]; 18 U.S.C. § 1956 - Laundering

of Monetary Instruments (relating to the laundering of monetary instruments); 18 U.S.C. §

2314 [Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or

articles used in counterfeiting]; and 18 U.S.C. § 2315 [Sale or receipt of stolen goods,

securities, moneys, or fraudulent State tax stamps]; and did so in violation of the RICO law

at 18 U.S.C. § l962(d), as enumerated above.

88. Plaintiff further alleges that all Defendants did commit two (2) or more of the offenses itemized above in a manner which they calculated and premeditated intentionally to threaten continuity, i.e. a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. § l962(d).

89. Plaintiff(s) also allege that they are not the only person that has been victimized by this RICO enterprise but, in fact, this RICO enterprise has victimized other persons and will if permitted to continue to operate will victimize other persons throughout New York State and the United States of America.

90. Plaintiff(s) further allege that they suffered injury to their business or property, including, without limitation, the loss to foreclosure of the Premises, which Premises is worth approximately Eight Hundred Thousand United States Dollars in the present market, and such predicate acts of the racketeering activity as mentioned above were the proximate cause of such injury and/or damages.

91. Plaintiff(s) allege that civil liability attaches to each Defendant on account of the above, and that the enterprise is distinct from each Defendant person.

**PLAINTTFF(S) DEMAND A TRIAL BY JURY**

92. Plaintiff(s) hereby demand a trial by jury in this action.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff(s) pray for judgment against Defendant(s) and asks this Court to:

93. Award the Plaintiff(s) damages in an amount to be determined at trial, but believed to be in excess of $1,600,000, including treble damages and punitive damages where warranted.

94. Award the Plaintiff(s) attorney's fees, disbursements, costs, and interest; and

95. Grant the Plaintiff(s) such other and further relief as the Court may deem just and proper.

January 30, 2018

/s/Jay Sanchez
_____
Jay Sanchez
The Law Office of J.A. Sanchez-Dorta, P.C.
225 Broadway
Suite 1901
New York, NY 10007
Tel:(646) 657 -5345
Fax: (347) 809-4540
Email: janthonysanchez@ post.harvard.edu
Attorney Bar Code JS3070
Counsel for Plaintiff(s)

## VERIFICATION

STATE OF NEW YORK

COUNTY OF QUEENS


NERY CHERY, being duly sworn, deposes and says:

I am the Plaintiff in the within action.

I have read (or have read to me) the foregoing Complaint and know the contents thereof.

That same is true to my knowledge, except as to those matters therein stated to be alleged

upon information and belief, and as to those matters I believe them to be true.


*Nery Chery*

NERY CHERY


Sworn to before me this

30th day of January, 2018


NOTARY PUBLIC


JAY A. SANCHEZ
Notary Public State Of New York
No.025A6196297
Qualified In Queens County
Commission Expires Nov. 10, 20_ _